Elaine A. Ryan (AZ Bar #012870)
Colleen M. Auer (AZ Bar #014637)
**AUER RYAN, P.C.**
20987 N. John Wayne Parkway, #B104-374
Maricopa, AZ 85139
Telephone: (520) 705-7332
eryan@auer-ryan.com
cauer@auer-ryan.com

*Attorneys for Plaintiff and the Proposed Class*

*(Additional Counsel Listed on Signature Page)*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michael Halpren**,** on behalf of himself and all others similarly situated, | No. |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| Carvin Wilson Software, LLC., d/b/a Carvin Software**,** | |
| Defendant. | **JURY TRIAL DEMANDED** |

Plaintiff Michael Halpren, ("Plaintiff") individually and on behalf of all others similarly situated, brings this action against Defendant Carvin Wilson Software, LLC., d/b/a Carvin Software ("Defendant" or "Carvin"). The following allegations are based on Plaintiff's knowledge, investigations of counsel, facts of public record, and information and belief.

## NATURE OF THE ACTION

1.      Plaintiff seeks to hold Carvin, a company offering software and consulting services to staffing and financial management companies, responsible for the injuries it

inflicted on Plaintiff and similarly situated persons arising from a data breach of Carvin's systems between February 22 and March 9, 2023 (the "Data Breach"). Carvin's negligent cybersecurity practices resulted in the exposure of the personal information of Plaintiff and those similarly situated to cybercriminals. Upon information and belief, the Data Breach involved approximately 187,360 consumers. [1]

2.    The data that Carvin exposed to cybercriminals was highly sensitive. The exposed data includes personal identifying information ("PII") like Social Security Numbers, names, addresses, and financial information.[2]

3.    Carvin collected PII and then maintained that sensitive data in a negligent and/or reckless manner. As evidenced by the Data Breach, Carvin inadequately maintained its network—rendering it easy prey for cybercriminals.

4.    Upon information and belief, the risk of the Data Breach was known to Carvin. Thus, Carvin was on notice that its inadequate data security created a heightened risk of exposure, compromise, and theft.

5.    After the Data Breach, Carvin failed to provide timely notice ("Breach Notice") to the Plaintiff and Class Members thereby exacerbating their injuries. Carvin's dilatory notice deprived Plaintiff and Class Members of the chance to take speedy measures to protect themselves and mitigate harm. Simply put, Carvin's dilatory notice impermissibly left Plaintiff and Class Members in the dark thereby causing their injuries to fester and the damage to spread. An example of the Breach Notice is attached as **Exhibit 1** (example of breach notice).

6.    Today, the identities of Plaintiff and Class Members are in jeopardy—all because of Carvin's negligence. Specifically, Plaintiff and Class Members now suffer from

---

[1] Carvin Software Data Breach Affects 187, 360 Consumers, JD Supra, https://www.jdsupra.com/legalnews/carvin-software-data-breach-affects-187-8824546/ (last accessed Feb. 23, 2023).

[2] *Id.*

a present and continuing risk of fraud and identity theft. And now, Plaintiff and Class Members must constantly monitor their financial accounts.

7.    Armed with the PII stolen in the Data Breach, criminals can commit a litany of crimes. Specifically, criminals can now open new financial accounts in Class Members' names, take out loans using Class Members' identities, use Class Members' names to obtain medical services, use Class Members' identities to obtain government benefits, file fraudulent tax returns using Class Members' information, obtain driver's licenses in Class Members' names (but with another person's photograph), and give false information to police during an arrest.

8.    Plaintiff and Class Members have suffered—and will continue to suffer—from the loss of the benefit of their bargain, unexpected out-of-pocket expenses, lost or diminished value of their PII, emotional distress, and the value of their time reasonably incurred to mitigate the fallout of the Carvin's Data Breach.

9.    Through this action, Plaintiff seeks to remedy these injuries on behalf of himself and all similarly situated individuals whose PII were exposed and compromised in the Data Breach.

10.    Plaintiff seeks remedies including, but not limited to, compensatory damages, treble damages, punitive damages, reimbursement of out-of-pocket costs, and injunctive relief—including improvements to Carvin's data security systems, and future annual audits.

11.    Plaintiff brings this action against Carvin and asserts claims for: (1) negligence; (2) unjust enrichment; (3) breach of contract; (4) violation of California's Consumer Privacy Act; (5) violation of California's Unfair Competition Law; (6) breach of fiduciary duty; and (7) Declaratory Judgment and Injunctive Relief.

## PARTIES

12.    Plaintiff, Michael Halpren, is a natural person and citizen of California, where he intends to remain.

13.     Defendant, Carvin Wilson Software, LLC., is an Arizona Corporation with its principal place of business at 70 S. Val Vista Dr. Ste A3, Gilbert, Arizona 85296.

## JURISDICTION AND VENUE

14.     This Court has original jurisdiction under the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because this is a class action involving more than 100 putative class members and the amount in controversy exceeds $5,000,000, exclusive of interest and costs. Plaintiff and Defendant are citizens of different states.

15.     This Court has general personal jurisdiction over Carvin because Carvin's principal place of business and headquarters are in Gilbert, Arizona. Carvin regularly conducts substantial business in Arizona.

16.     Venue is proper in this District under 28 U.S.C. §§ 1391(a)(2), 1391(b)(2), and 1391(c)(2) because a substantial part of the events and omissions giving rise to the claims emanated from activities within this District, and Carvin conducts substantial business in this District.

## FACTUAL ALLEGATIONS

### Carvin Collected and Stored the PII of Plaintiff and Class Members

17.     Defendant Carvin is a software and consulting company that designs and develops software solutions for staffing and financial companies.[3] These software solutions include payroll management, time and attendance management, and accounting.[4] Carvin boasts a total annual revenue of $25 million.[5]

---

[3] Carvin    Software,    Tracxn,    https://tracxn.com/d/companies/carvin-software/__p0embk4OZ-xhVdIK7ID1qr40pgw2_anfJ0YStgQxMNM (last accessed May 12, 2023).

[4] Carvin    Wilson,    Linkedin,    https://www.linkedin.com/in/carvinwilson?original_referer= (last accessed May 12, 2023).

[5] Carvin Software Data Breach, JD Supra, https://www.jdsupra.com/legalnews/carvin-software-data-breach-affects-187-8824546/#:~:text=Carvin%20Software%20employs%20more%20than,%245%20million%20in%20annual%20revenue (last accessed May 12, 2023).

18.     Carvin's software and consulting services are specialized for companies who oversee highly sensitive data. Understanding this sensitive nature of its clients' data, Carvin promises that it will "keep your information safe":[6]



19.     Carvin boasts that its software enables "hundreds of clients" to "constantly process[] payroll every day of the week" and assures its clients and consumers that they will "feel confident working with us" and to "rely on Staffing Complete".[7]

20.     Carvin also claims that, in addition to its product being reliable and secure, its software solutions are also affordable, "with the core features that allow companies to [] reduce costs":



Do you spend most of your budget on maintaining your current system? Our goal is not to nickel-and-dime our clients for every request, support call, or new feature. We understand that staffing and FMS offices operate on a small profit margin; so we set out to build affordable software solutions with the core features that allow companies to be efficient, productive, innovative, and reduce cost.

---

[6] Carvin Software, https://carvinsoftware.com/ (last accessed May 12, 2023).

[7] Staffing Complete, Carvin Software, https://carvinsoftware.com/staffing-complete (last accessed May 12, 2023).

21.    Upon information and belief, Carvin maintains records of individuals' information such as consumers' full names, Social Security Numbers, and financial account information, in the ordinary course of business. These records are stored on Carvin's computer systems.

22.    When Carvin collects this sensitive information, it promises to use reasonable measures to safeguard the PII from theft and misuse.

23.    Carvin acquired, collected, and stored, and represented that it maintained reasonable security over Plaintiff's and Class Members' PII.

24.    On information and belief, Carvin acquired, *inter alia*, the following types of information: names, Social Security Numbers, and financial account information.

25.    By obtaining, collecting, and storing Plaintiff's and Class Members' PII, Carvin assumed legal and equitable duties and knew, or should have known, that it was thereafter responsible for protecting Plaintiff and Class Members' PII from unauthorized disclosure.

26.    Plaintiff and Class Members have taken reasonable steps to maintain the confidentiality of their PII, including but not limited to, protecting their usernames and passwords, using only strong passwords for their accounts, and refraining from browsing potentially unsafe websites.

27.    Upon information and belief, Plaintiff and Class Members relied on Carvin to keep their PII confidential and securely maintained, to use this information for business purposes only, and to make only authorized disclosures of this information.

28.    Carvin could have prevented the Data Breach by properly securing and encrypting and/or more securely encrypting its servers generally, as well as Plaintiff's and Class Members' PII.

29.    Carvin's negligence in safeguarding Plaintiff's and Class Members' PII was exacerbated by repeated warnings and alerts directed to the increased need to protect and secure sensitive data, as evidenced by the trending data breach attacks in recent years.

30.    Despite the prevalence of public announcements of data breaches and data security compromises, Carvin failed to take appropriate steps to protect Plaintiff's and Class Members' PII from being compromised.

31.    Carvin failed to properly monitor and log the ingress and egress of its third-party network traffic for malware and threats, admitting that on March 9, 2023, Carvin discovered "unusual activities [in its] systems" that were the result of unauthorized access perpetuated by cybercriminals. Exh. 1.

32.    Carvin failed to provide fair, reasonable, or adequate computer systems and data security practices to safeguard the PII of Plaintiff and Class Members.

33.    Carvin failed to timely and accurately disclose that Plaintiff's and Class Members' PII had been improperly acquired or accessed.

34.    Carvin knowingly disregarded standard information security principles, despite obvious risks, by allowing unmonitored and unrestricted access to unsecured PII.

35.    Carvin failed to provide adequate supervision and oversight of the PII with which it was and is entrusted, in spite of the known risk and foreseeable likelihood of breach and misuse, which permitted an unknown third party to gather PII of Plaintiff and Class Members, misuse the PII and potentially disclose it to others without consent.

36.    Upon information and belief, Carvin failed to adequately train its employees to not store PII longer than absolutely necessary.

37.    Upon information and belief, Carvin failed to implement procedures so that PII was maintained no longer than absolutely necessary.

38.    Upon information and belief, Carvin failed to consistently enforce security policies aimed at protecting Plaintiff's and the Class Members' PII.

39.    Upon information and belief, Carvin failed to implement sufficient processes to quickly detect data breaches, security incidents, or intrusions.

*Carvin's Data Breach*

40.    On March 27, 2023, almost a month after the Data Breach first began, Carvin's internal investigation revealed that cybercriminals had gained access to at least twenty-nine of Carvin's clients' consumer PII. Exh. 1.

41.    Additionally, Defendant admits in its Breach Notice that Plaintiff's and the Class's PII was actually stolen during the Data Breach, confessing that the information was not accessed but that "files were **copied from the network**". Exh. 1.

42.    Upon information and belief, cybercriminals were able to breach Carvin's systems because Carvin did not maintain reasonable security safeguards or protocols to protect consumers' PII, leaving it an unguarded target for theft and misuse.

43.    Despite becoming aware of the breach as early as March 9, 2023, Carvin did not begin notifying victims of the Data Breach until May 2, 2023, over two months later. Exh. 1.

44.    Time is of the essence when highly sensitive PII is subject to unauthorized access and/or acquisition. The disclosed, accessed, and/or acquired PII of Plaintiff and Class Members is likely available on the Dark Web. Hackers can access and then offer for sale the unencrypted, unredacted PII to criminals. Plaintiff and Class Members are now subject to the present and continuing risk of fraud, identity theft, and misuse resulting from the possible publication of their PII, especially their Social Security Numbers, onto the Dark Web. Plaintiff and Class Members now face a lifetime risk of identity theft, which is heightened here by unauthorized access, theft, and/or disclosure of thousands of Social Security Numbers.

45.    Following the Data Breach and recognizing that each Class Member is now subject to the present and continuing risk of identity theft and fraud, Carvin "encourage[d] [its victims] to remain vigilant against incidents of identity theft and fraud by reviewing [their] account statements and monitoring [] for suspicious activity". Exh. 1. Carvin also advised its victims to "review the "Steps You Can Take to Help Protect Personal

Information "section of [the Breach Notice]". This recommendation is ironic as Carvin' failure to take steps to protect its consumers' personal information is what caused the Data Breach in the first place.

46.     Additionally, these measures are insufficient to protect Plaintiff and Class Members from the lifetime risks each now face. As another element of damages, Plaintiff and Class Members seek a sum of money sufficient to provide to Plaintiff and Class Members identity theft protective services for their respective lifetimes.

47.     Carvin put the burden squarely on Plaintiff and Class Members to take measures to protect themselves.

48.     Time is a compensable and valuable resource in the United States. According to the U.S. Bureau of Labor Statistics, 55.5% of U.S.-based workers are compensated on an hourly basis, while the other 44.5% are salaried.[8]

49.     According to the U.S. Bureau of Labor Statistics' 2018 American Time Use Survey, American adults have only 36 to 40 hours of "leisure time" outside of work per week;[9] leisure time is defined as time not occupied with work or chores and is "the time equivalent of 'disposable income.'"[10] Usually, this time can be spent at the option and choice of the consumer, however, having been notified of the Data Breach, consumers now have to spend hours of their leisure time self-monitoring their accounts, communicating

---

[8] Characteristics of minimum wage workers, 2020, U.S. Bureau of Labor Statistics, https://www.bls.gov/opub/reports/minimum-wage/2020/home.htm#:~:text= In%202020%2C%2073.3%20million%20workers,wage%20of%20%247.25%20per%20h our (last accessed May 12, 2023); Average Weekly Wage Data, U.S. Bureau of Labor Statistics,    https://data.bls.gov/cew/apps/table_maker/v4/table_maker.htm%23type=1& year=2021&qtr=3&own=5&ind=10&supp=0 (last accessed May 12, 2023).

[9]   You're spending your free time wrong — here's what to do to be happier and more successful,    CNBC    https://www.cnbc.com/2019/11/06/how-successful-people-spend-leisure-time-james-wallman.html (last accessed May 12, 2023).

[10] *Id.*

with financial institutions and government entities, and placing other prophylactic measures in place to attempt to protect themselves.

50.    Plaintiff and Class Members are now deprived of the choice as to how to spend their valuable free hours and seek renumeration for the loss of valuable time as another element of damages.

51.    Upon information and belief, the unauthorized third-party cybercriminals gained access to Plaintiff's and Class Members' PII and financial information with the intent of engaging in misuse of the PII and financial information, including marketing and selling Plaintiff's and Class Members' PII.

52.    Carvin's Breach Notice letter omits the size and scope of the breach. Carvin has demonstrated a pattern of providing inadequate notices and disclosures about the Data Breach.

53.    Plaintiff and the Class Members remain, even today, in the dark regarding the exact dates when the Data Breach took place, the number of victims impacted, and what steps are being taken, if any, to secure their PII going forward. Plaintiff and Class Members are left to speculate as to the full impact of the Data Breach and how exactly Carvin intends to enhance its information security systems and monitoring capabilities so as to prevent further breaches.

54.    Plaintiff's and Class Members' PII may end up for sale on the dark web, or simply fall into the hands of companies that will use the detailed PII for targeted marketing without the approval of Plaintiff and/or Class Members. Either way, unauthorized individuals can now easily access the PII of Plaintiff and Class Members.

/ / / /
/ / / /
/ / / /
/ / / /
/ / / /

*Carvin Failed to Comply with FTC Guidelines*

55.    According to the Federal Trade Commission ("FTC"), the need for data security should be factored into all business decision-making.[11] To that end, the FTC has issued numerous guidelines identifying best data security practices that businesses, such as Carvin, should employ to protect against the unlawful exposure of PII.

56.    In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established guidelines for fundamental data security principles and practices for business.[12] The guidelines explain that businesses should:

a.    protect the personal consumer information that they keep;

b.    properly dispose of personal information that is no longer needed;

c.    encrypt information stored on computer networks;

d.    understand their network's vulnerabilities; and

e.    implement policies to correct security problems.

57.    The guidelines also recommend that businesses watch for large amounts of data being transmitted from the system and have a response plan ready in the event of a breach.

58.    The FTC recommends that companies not maintain PII longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.[13]

---

[11]   Start with Security: A Guide for Business, Federal Trade Commission, https://bit.ly/3uSoYWF (last accessed May 12, 2023).

[12]   Protecting Personal Information: A Guide for Business, Federal Trade Commission, https://bit.ly/3u9mzre (last accessed May 12, 2023).

[13]   *See* Start with Security, *supra* note 11.

59.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect consumer data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act ("FTCA"), 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

60.     Carvin's failure to employ reasonable and appropriate measures to protect against unauthorized access to consumer PII constitutes an unfair act or practice prohibited by Section 5 of the FTCA, 15 U.S.C. § 45.

***Carvin Failed to Follow Industry Standards***

61.     Despite its alleged commitments to securing sensitive consumer data, Carvin does not follow industry standard practices in securing consumers' PII.

62.     Several best practices have been identified that, at a minimum, should be implemented by businesses like Carvin, including but not limited to: educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and, limiting which employees can access sensitive data.

63.     Other best cybersecurity practices that are standard in the business industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; protection against any possible communication system; training staff regarding critical points.

64.     Carvin failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the

Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

65.    Such frameworks are the existing and applicable industry standards in the business industry. And Carvin failed to comply with these accepted standards—thus opening the door to criminals and the Data Breach.

***Plaintiff Halpren's Experience***

66.    Plaintiff is unsure how Carvin got his information but assumes a staffing company receiving its software and financial accounting services from Carvin provided Carvin with his PII, including but not limited to his name, Social Security Number, and financial information.

67.    In collecting and maintaining the PII, Carvin implicitly agrees it will safeguard the data using reasonable means according to its internal policies and state and federal law.

68.    Carvin deprived Plaintiff of the earliest opportunity to guard himself against the Data Breach's effects by failing to notify him about it for over two months.

69.    In fact, following the Data Breach, Plaintiff was notified by his bank regarding a fraudulent attempt to use his Apple Pay account to make a purchase.  This demonstrates that Plaintiff's information was stolen in the Data Breach and has been placed in the hands of cybercriminals.

70.    As a result of the Data Breach and the recommendation of Defendant's Notice, Mr. Halpren has spent time dealing with the consequences of the Data Breach, which includes time spent verifying the legitimacy of the Breach Notice  and self-monitoring his accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

71.    Mr. Halpren has spent and will spend considerable time and effort monitoring his accounts to protect himself from identity theft. Mr. Halpren fears for his personal financial security and the uncertainty over what PII was exposed in the Data

Breach. Mr. Halpren has and is experiencing feelings of anxiety, sleep disruption, stress, fear, and frustration because of the Data Breach. This goes far beyond allegations of mere worry or inconvenience; it is exactly the sort of injury and harm to a Data Breach victim that the law contemplates and addresses.

72.    Plaintiff suffered actual injury from the exposure of his PII —which violates his rights to privacy.

73.    Plaintiff has suffered actual injury in the form of damages to, and diminution in the value of, his PII —a form of intangible property that Plaintiff entrusted to Defendant, which was compromised in and as a result of the Data Breach.

74.    Mr. Halpren has suffered imminent and impending injury arising from the substantially increased risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of unauthorized third parties and possibly criminals.

75.    Mr. Halpren has a continuing interest in ensuring that his PII, which, upon information and belief, remains backed up in Defendant's possession, is protected, and safeguarded from future breaches.

***Plaintiff and the Proposed Class Face Significant Risk of Present and Continuing Identity Theft***

76.    Plaintiff and Class Members suffered injury from the misuse of their PII that can be directly traced to Carvin.

77.    The ramifications of Carvin's failure to keep Plaintiff's and the Class's PII secure are severe. Identity theft occurs when someone uses another's personal and financial information such as that person's name, account number, Social Security Number, driver's license number, date of birth, and/or other information, without permission, to commit fraud or other crimes.

78.    According to experts, one out of four data breach notification recipients become a victim of identity fraud.[14]

79.    As a result of Carvin's failures to prevent—and to timely detect—the Data Breach, Plaintiff and Class Members suffered, and will continue to suffer, damages, including monetary losses, lost time, anxiety, and emotional distress. They have suffered or are at a present risk of suffering:

    a.    The loss of the opportunity to control how their PII is used;

    b.    The diminution in value of their PII;

    c.    The compromise and continuing publication of PII;

    d.    Out-of-pocket costs associated with the prevention, detection, recovery, and remediation from identity theft or fraud;

    e.    Lost opportunity costs and lost wages associated with the time and effort expended addressing and attempting to mitigate the actual and future consequences of the Data Breach, including, but not limited to, efforts spent researching how to prevent, detect, contest, and recover from identity theft and fraud;

    f.    Delay in receipt of tax refund monies;

    g.    Unauthorized use of stolen PII; and

    h.    The continued risk to their PII, which remains in the possession of Carvin and is subject to further breaches so long as Carvin fails to undertake the appropriate measures to protect the PII in its possession.

---

[14] More Than 12 Million Identity Fraud Victims in 2012 According to Latest Javelin Strategy & Research Report Business Wire, https://threatpost.com/study-shows-one-four-who-receive-data-breach-letter-become-fraud-victims-022013/77549/ (last accessed May 12, 2023).

80.    Stolen PII is one of the most valuable commodities on the criminal information black market. According to Experian, a credit-monitoring service, stolen PII can be worth up to $1,000.00 depending on the type of information obtained.[15]

81.    The value of Plaintiff's and the proposed Class's PII on the black market is considerable. Stolen PII trades on the black market for years, and criminals frequently post stolen PII openly and directly on various "dark web" internet websites, making the information publicly available, for a substantial fee of course.

82.    Social Security numbers are particularly attractive targets for hackers because they can easily be used to perpetrate identity theft and other highly profitable types of fraud. Moreover, Social Security numbers are difficult to replace, as victims are unable to obtain a new number until the damage is done.

83.    It can take victims years to spot or identify PII theft, giving criminals plenty of time to milk that information for cash.

84.    One such example of criminals using PII for profit is the development of "Fullz" packages.

85.    Cyber-criminals can cross-reference two sources of PII to marry unregulated data available elsewhere to criminally stolen data with an astonishingly complete scope and degree of accuracy in order to assemble complete dossiers on individuals. These dossiers are known as "Fullz" packages.

86.    The development of "Fullz" packages means that stolen PII from the Data Breach can easily be used to link and identify it to Plaintiff's and the proposed Class's phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information such as emails, phone numbers, or credit card numbers may not be included in the PII stolen by the cyber-criminals in the Data Breach, criminals

---

[15] Here's How Much Your Personal Information Is Selling for on the Dark Web, Experien  https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/ (last accessed May 12, 2023).

can easily create a Fullz package and sell it at a higher price to unscrupulous operators and criminals (such as illegal and scam telemarketers) over and over. That is exactly what is happening to Plaintiff and members of the proposed Class, and it is reasonable for any trier of fact, including this Court or a jury, to find that Plaintiff's and other members of the proposed Class's stolen PII is being misused, and that such misuse is fairly traceable to the Data Breach.

87.    According to the FBI's Internet Crime Complaint Center (IC3) 2019 Internet Crime Report, Internet-enabled crimes reached their highest number of complaints and dollar losses that year, resulting in more than $3.5 billion in losses to individuals and business victims.

88.    Further, according to the same report, "rapid reporting can help law enforcement stop fraudulent transactions before a victim loses the money for good." Carvin did not rapidly report to Plaintiff and the Class that their PII had been stolen.

89.    Victims of identity theft also often suffer embarrassment, blackmail, or harassment in person or online, and/or experience financial losses resulting from fraudulently opened accounts or misuse of existing accounts.

90.    In addition to out-of-pocket expenses that can exceed thousands of dollars and the emotional toll identity theft can take, some victims have to spend a considerable time repairing the damage caused by the theft of their PII. Victims of new account identity theft will likely have to spend time correcting fraudulent information in their credit reports and continuously monitor their reports for future inaccuracies, close existing bank/credit accounts, open new ones, and dispute charges with creditors.

91.    Further complicating the issues faced by victims of identity theft, data thieves may wait years before attempting to use the stolen PII. To protect themselves, Plaintiff and the Class will need to remain vigilant against unauthorized data use for years or even decades to come.

92.     The FTC has also recognized that consumer data is a new and valuable form of currency. In an FTC roundtable presentation, former Commissioner Pamela Jones Harbour stated that "most consumers cannot begin to comprehend the types and amount of information collected by businesses, or why their information may be commercially valuable. Data is currency."[16]

93.     The FTC has also issued numerous guidelines for businesses that highlight the importance of reasonable data security practices. The FTC has noted the need to factor data security into all business decision-making.[17] According to the FTC, data security requires: (1) encrypting information stored on computer networks; (2) retaining payment card information only as long as necessary; (3) properly disposing of personal information that is no longer needed; (4) limiting administrative access to business systems; (5) using industry-tested and accepted methods for securing data; (6) monitoring activity on networks to uncover unapproved activity; (7) verifying that privacy and security features function properly; (8) testing for common vulnerabilities; and (9) updating and patching third-party software.[18]

94.     According to the FTC, unauthorized PII disclosures are extremely damaging to consumers' finances, credit history and reputation, and can take time, money, and patience to resolve the fallout.[19] The FTC treats the failure to employ reasonable and

---

[16] Commissioner Pamela Jones Harbour: Remarks Before FTC Exploring Privacy Roundtable, Federal Trade Commission, https://www.ftc.gov/sites/default/files/documents/public_statements/remarks-ftc-exploring-privacy-roundtable/091207privacyroundtable.pdf (last accessed May 12, 2023).

[17] Start With Security, A Guide for Business, Federal Trade Commission, https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf (last accessed May 12, 2023).

[18] Id.

[19] Taking Charge, What to Do If Your Identity is Stolen, Federal Trade Commission, at 3 (2012), https://www.ojp.gov/ncjrs/virtual-library/abstracts/taking-charge-what-do-if-your-identity -stolen (last accessed May 12, 2023).

appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5(a) of the FTCA.

95.    To that end, the FTC has issued orders against businesses that failed to employ reasonable measures to secure sensitive payment card data. *See In the matter of Lookout Services, Inc.*, No. C-4326, ₱ 7 (June 15, 2011) ("[Defendant] allowed users to bypass authentication procedures" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks, such as employing an intrusion detection system and monitoring system logs."); *In the matter of DSW, Inc.*, No. C-4157, ₱ 7 (Mar. 7, 2006) ("[Defendant] failed to employ sufficient measures to detect unauthorized access."); *In the matter of The TJX Cos., Inc.*, No. C-4227 (Jul. 29, 2008) ("[R]espondent stored . . . personal information obtained to verify checks and process unreceipted returns in clear text on its in-store and corporate networks[,]" "did not require network administrators . . . to use different passwords to access different programs, computers, and networks[,]" and "failed to employ sufficient measures to detect and prevent unauthorized access to computer networks . . ."); *In the matter of Dave & Buster's Inc.*, No. C-4291 (May 20, 2010) ("[Defendant] failed to monitor and filter outbound traffic from its networks to identify and block export of sensitive personal information without authorization" and "failed to use readily available security measures to limit access between instore networks . . ."). These orders, which all preceded the Data Breach, further clarify the measures businesses must take to meet their data security obligations. Carvin thus knew or should have known that its data security protocols were inadequate and were likely to result in the unauthorized access to and/or theft of PII.

/ / / /

/ / / /

/ / / /

/ / / /

/ / / /

96.    Over the past several years, data breaches have become alarmingly commonplace. In 2016, the number of data breaches in the U.S. exceeded 1,000, a 40% increase from 2015.[20] The next year, that number increased by nearly 45%.[21]

97.    Charged with handling highly sensitive personal information, Carvin knew or should have known the importance of safeguarding the PII that was entrusted to it. Carvin also knew or should have known of the foreseeable consequences if its data security systems were breached. This includes the significant costs that would be imposed on Carvin's consumers as a result of a breach. Carvin nevertheless failed to take adequate cybersecurity measures to prevent the Data Breach from occurring.

98.    Carvin disclosed the PII of Plaintiff and members of the proposed Class for criminals to use in the conduct of criminal activity. Specifically, Carvin opened, disclosed, and exposed the PII of Plaintiff and members of the proposed Class to people engaged in disruptive and unlawful business practices and tactics, including online account hacking, unauthorized use of financial accounts, and fraudulent attempts to open unauthorized financial accounts (i.e., identity fraud), all using the stolen PII.

99.    Carvin's use of outdated and insecure computer systems and software that are easy to hack, and its failure to maintain adequate security measures and an up-to-date technology security strategy, demonstrates a willful and conscious disregard for privacy, and has exposed the PII of Plaintiff and potentially thousands of members of the proposed Class to unscrupulous operators, con artists, and outright criminals.

100.    Carvin's failure to properly notify Plaintiff and members of the proposed Class of the Data Breach then exacerbated Plaintiff's and members of the proposed Class's

---

[20] Data Breaches Increase 40 Percent in 2016, Identity Theft Resource Center (Jan. 19, 2017), https://bit.ly/30Gew91(last accessed May 12, 2023).

[21] Data Breaches Up Nearly 45 Percent According to Annual Review by Identity Theft Resource Center and CyberScout, Identity Theft Resource Center (Jan. 22, 2018), https://bit.ly/3jdGcYR (last accessed May 12, 2023).

injury by depriving them of the earliest ability to take appropriate measures to protect their PII and take other necessary steps to mitigate the harm caused by the Data Breach.

***Defendant's Offer of Credit Monitoring is Inadequate***

101.    At present, Carvin has offered either one or two years of free credit monitoring and identity protection services, provided by IDX, to breach victims.

102.    As previously alleged, Plaintiff's and the Class Members' PII may exist on the Dark Web and in the public domain for years before it is used for ill gains and actions. With only one or two years of monitoring, Plaintiff and Class Members remain unprotected from the real and long-term threats against their personal, sensitive, and private data. Indeed, the breach involves PII that cannot be changed, such as Social Security numbers.

103.    Therefore, the "monitoring" services offered by Carvin are inadequate, and Plaintiff and Class Members have a real and cognizable interest in obtaining equitable relief, in addition to the monetary relief requested herein.

## CLASS ACTION ALLEGATIONS

104.    Plaintiff brings this action on behalf of himself and on behalf of all other persons similarly situated ("the Classes") under Fed. R. Civ. P. 23(b)(2), 23(b)(3), and 23(c)(4).

105.    Plaintiff proposes the following Class definitions, subject to amendment as appropriate:

**Nationwide Class:**

**All individuals in the United States whose PII was accessed without authorization in the Carvin Data Breach, including all those who received a notice of the Data Breach.**

/ / / /

/ / / /

/ / / /

**California Subclass:**

**All individuals residing in California whose PII was accessed without authorization in the Carvin Data Breach, including all those who received a notice of the Data Breach.**

106.    The following people are excluded from the Class: (1) any judge or magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, affiliated entities, and any entity in which the Defendant or its parent has a controlling interest, and their current or former officers and directors; (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

107.    Plaintiff reserves the right to amend the Class definition or add a Class if further information and discovery indicate that other classes should be added and if the definition of the Class should be narrowed, expanded, or otherwise modified.

108.    Plaintiff satisfies the numerosity, commonality, typicality, and adequacy requirements under Fed. R. Civ. P. 23.

109.    **Numerosity.** Plaintiff is representative of the proposed Class, consisting of 187,360 members, far too many to join in a single action;

110.    **Commonality.** There are many questions of law and fact common to the Classes. And these common questions predominate over any individualized questions of Class Members. These common questions of law and fact include, without limitation.

        a.    Whether Carvin had a duty to use reasonable care in safeguarding Plaintiff's and the Class's PII;

b.  Whether Carvin failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

c.  Whether Carvin was negligent in maintaining, protecting, and securing PII;

d.  Whether Carvin took reasonable measures to determine the extent of the Data Breach after discovering it;

e.  Whether Carvin's Breach Notice was reasonable;

f.  Whether the Data Breach caused Plaintiff and the Class injuries;

g.  What the proper damages measure is;

h.  Whether Carvin violated the statutes alleged in this Complaint; and

i.  Whether Plaintiff and the Class are entitled to damages, treble damages, or injunctive relief.

111.  **Typicality.** Plaintiff's claims are typical of those of other Class Members because Plaintiff's information, like that of every other Class Member, was compromised in the Data Breach. Moreover, Plaintiff and Class Members were subjected to Carvin's uniformly illegal and impermissible conduct.

112.  **Predominance.** Carvin has engaged in a common course of conduct toward Plaintiff and Class Members, in that Plaintiff's and Class Members' data was stored on the same computer system and unlawfully exposed in the same way. The common issues arising from Carvin's conduct affecting Class Members, set out above, predominate over any individualized issues. Adjudication of these common issues in a single action has important and desirable advantages of judicial economy.

113.  **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of the controversy. Class treatment of common questions of law and fact is superior to multiple individual actions or piecemeal litigation. Absent a class action, most Class Members would likely find that the cost of litigating their individual claims is prohibitively high and would therefore have no effective remedy. The prosecution

23

of separate actions by individual Class Members would create a risk of inconsistent or varying adjudications with respect to individual Class Members, which would establish incompatible standards of conduct for Carvin. In contrast, the conduct of this action as a Class action presents far fewer management difficulties, conserves judicial resources, the parties' resources, and protects the rights of each Class Member.

114.   The litigation of the claims brought herein is manageable. Carvin's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

115.   Adequate notice can be given to Class Members directly using information maintained in Carvin's records.

116.   Carvin has acted on grounds that apply generally to the Class as a whole, so that Class certification, injunctive relief, and corresponding declaratory relief are appropriate on a Class-wide basis.

**FIRST CAUSE OF ACTION**
**Negligence**
**(On behalf of Plaintiff and the Class, or, in the alternative, the California Subclass)**

117.   Carvin re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

118.   Carvin required consumers, including Plaintiff and Class Members, to submit non-public PII to it in its ordinary course of business.

119.   By collecting and storing this data in its computer system and network for its own commercial gain, Carvin owed a duty of care to use reasonable means to secure and safeguard its computer system—and Class Members' PII held within it—to prevent disclosure of the information, and to safeguard the information from theft. Carvin's duty included a responsibility to implement processes so it could detect a breach of its security

systems in a reasonably expeditious period of time and to give prompt notice to those affected in the case of a data breach.

120.    The risk that unauthorized persons would attempt to gain access to the PII and misuse it was foreseeable. Given that Carvin holds vast amounts of PII, it was inevitable that unauthorized individuals would, at some point, try to access Carvin's databases of PII.

121.    After all, PII is highly valuable, and Carvin knew, or should have known, the risk in obtaining, using, handling, emailing, and storing the PII of Plaintiff and Class Members. Thus, Carvin knew, or should have known, the importance of exercising reasonable care in handling the PII entrusted to it.

122.    Carvin owed a duty of care to Plaintiff and Class Members to provide data security consistent with industry standards and other requirements discussed herein, and to ensure that its systems and networks, and the personnel responsible for them, adequately protected the PII.

123.    Carvin's duty of care to use reasonable security measures arose because of the special relationship that existed between Carvin and consumers, which is recognized by laws and regulations. That special relationship arose because Carvin was in a superior position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a data breach.

124.    Under the FTCA, Carvin had a duty to employ reasonable security measures. Specifically, this statute prohibits "unfair . . . practices in or affecting commerce," including (as interpreted and enforced by the FTC) the unfair practice of failing to use reasonable measures to protect confidential data.[22]

125.    Moreover, Plaintiff's and Class Members' injuries are precisely the type of injuries that the FTCA guards against. After all, the FTC has pursued numerous

---

[22] 15 U.S.C. §45.

enforcement actions against businesses that—because of their failure to employ reasonable data security measures and avoid unfair and deceptive practices—caused the very same injuries that Defendant inflicted upon Plaintiff and Class Members.

126.    Under the Arizona Data Breach Notification Act, Carvin has a duty to promptly notify affected persons of a data breach so that they can take action to protect themselves.   Specifically, if "the investigation [of a potential data breach] results in a determination that there has been a security system breach, the person that owns or licenses the computerized data, within forty-five days after the determination, shall . . . [n]otify the individuals affected."[23]

127.    Moreover, Plaintiff's and Class Members' injuries are precisely the type of injuries that the Arizona Data Breach Notification Act guards against.

128.    Carvin's duty to use reasonable care in protecting confidential data arose not only because of the statutes and regulations described above, but also because Carvin is bound by industry standards to protect confidential PII.

129.    Carvin owed Plaintiff and members of the Class a duty to notify them within a reasonable time frame of any breach to their PII. Defendant also owed a duty to timely and accurately disclose to Plaintiff and members of the Class the scope, nature, and occurrence of the Data Breach. This duty is necessary for Plaintiff and Class Members to take appropriate measures to protect their PII, to be vigilant in the face of an increased risk of harm, and to take other necessary steps in an effort to mitigate the fallout of Carvin's Data Breach.

130.    Carvin owed these duties to Plaintiff and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Carvin knew or should have known would suffer injury-in-fact from its inadequate security

---

[23] A.R.S §§18-551, 18-552.

protocols. After all, Carvin actively sought and obtained the PII of Plaintiff and Class Members.

131.    Carvin breached its duties, and thus was negligent, by failing to use reasonable measures to protect Plaintiff's and Class Members' PII. And, but for Carvin's negligence, Plaintiff and Class Members would not have been injured. The specific negligent acts and omissions committed by Carvin include, but are not limited to:

a.    Failing to adopt, implement, and maintain adequate security measures to safeguard Class Members' PII;

b.    Failing to comply with—and thus violating—the FTCA and its regulations;

c.    Failing to comply with—and thus violating—the Arizona Data Breach Notification Act and its regulations;

d.    Failing to adequately monitor the security of its networks and systems;

e.    Failing to ensure that its email system had plans in place to maintain reasonable data security safeguards;

f.    Failing to have in place mitigation policies and procedures;

g.    Allowing unauthorized access to Class Members' PII;

h.    Failing to detect in a timely manner that Class Members' PII had been compromised; and

i.    Failing to timely notify Class Members about the Data Breach so that they could take appropriate steps to mitigate the potential for identity theft and other damages.

132.    It was foreseeable that Carvin's failure to use reasonable measures to protect Class Members' PII would result in injury to Class Members. Furthermore, the breach of security was reasonably foreseeable given the known high frequency of cyberattacks and data breaches in the business industry. It was therefore foreseeable that the failure to

adequately safeguard Class Members' PII would result in one or more types of injuries to Class Members.

133.    Simply put, Carvin's negligence actually and proximately caused Plaintiff and Class Members' actual, tangible, injuries-in-fact and damages. These injuries include, but are not limited to, the theft of their PII by criminals, improper disclosure of their PII, lost value of their PII, and lost time and money incurred to mitigate and remediate the effects of the Data Breach that resulted from and were caused by Carvin's negligence. Moreover, injuries-in-fact and damages are ongoing, imminent, and immediate.

134.    Plaintiff and Class Members are entitled to compensatory and consequential damages suffered because of the Data Breach.

**SECOND CAUSE OF ACTION**
**Third Party Beneficiary Breach of Contract**
**(On Behalf of Plaintiff and the Class)**

135.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

136.    Carvin entered into various contracts with its financial and staffing clients to provide software, payroll, and other services.

137.    These contracts are virtually identical to each other and were made expressly for the benefit of Plaintiff and the Class, as it was their confidential information that Carvin agreed to collect and protect through its services. Thus, the benefit of collection and protection of the PII belonging to Plaintiff and the Class were the direct and primary objective of the contracting parties.

138.    Carvin knew that if it were to breach these contracts with its staffing and financial clients, its consumers, including Plaintiff and the Class, would be harmed by, among other things, fraudulent misuse of their PII.

139.   PII breached its contracts with its clients when it failed to use reasonable data security measures that could have prevented the Data Breach and resulting compromise of Plaintiff's and Class Members' PII.

140.   As a reasonably foreseeable result of the breach, Plaintiff and the Class were harmed by Carvin's failure to use reasonable data security measures to store their PII, including but not limited to, the actual harm sustained from the loss of their PII to cybercriminals.

141.   Accordingly, Plaintiff and the Class are entitled to damages in an amount to be determined at trial, along with their costs and attorney fees incurred in this action.

## THIRD CAUSE OF ACTION
### Unjust Enrichment
### (On behalf of Plaintiff and the Class)

142.   Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

143.   This claim is pleaded in the alternative to the third-party beneficiary breach of contract claim.

144.   Plaintiff and Class Members conferred a benefit on Carvin in the form of profits to render certain services, a portion of which was intended to have been used by Carvin for data security measures to secure Plaintiff's and Class Members' PII.

145.   Carvin enriched itself by saving the costs it reasonably should have expended on data security measures to secure Plaintiff's and Class Members' PII. Instead of providing a reasonable level of security that would have prevented the Data Breach, Carvin chose to avoid its data security obligations at the expense of Plaintiff and Class Members by utilizing cheaper, ineffective security measures. Plaintiff and Class Members, on the other hand, suffered as a direct and proximate result of Carvin's failure to provide adequate security.

146.    Under the principles of equity and good conscience, Carvin should not be permitted to retain the full value of its profits resulting from its collection and storage of the Plaintiff's and Class Members' PII, because Carvin failed to implement appropriate data management and security measures that are mandated by industry standards.

147.    If Plaintiff and Class Members knew that Carvin had not secured their PII, they would not have agreed to disclose their data to Carvin's clients.

148.    Plaintiff and Class Members have no adequate remedy at law.

149.    As a direct and proximate result of Carvin's conduct, Plaintiff and Class Members have suffered—and will continue to suffer—a host of injuries, including but not limited to: (1) actual identity theft; (2) the loss of the opportunity to determine how their PII is used; (3) the compromise, publication, and/or theft of their PII; (4) out-of-pocket expenses associated with the prevention, detection, and recovery from identity theft, and/or unauthorized use of their PII; (5) lost opportunity costs associated with effort expended and the loss of productivity addressing and attempting to mitigate the actual and future consequences of the Data Breach, including but not limited to efforts spent researching how to prevent, detect, contest, and recover from identity theft; (6) the continued risk to their PII, which remain in Carvin's possession and are subject to further unauthorized disclosures so long as Carvin fails to undertake appropriate and adequate measures to protect the PII in its possession; and, (7) future expenditures of time, effort, and money that will be spent trying to prevent, detect, contest, and repair the impact of Carvin's Data Breach.

150.    As a direct and proximate result of Carvin's conduct, Plaintiff and Class Members suffered—and will continue to suffer—other forms of injury and/or harm.

151.    Carvin should be compelled to disgorge into a common fund or constructive trust, for the benefit of Plaintiff and Class Members, proceeds that it unjustly received from Plaintiff and Class Members.

**FOURTH CAUSE OF ACTION**
**Breach of Fiduciary Duty**
**(On behalf of Plaintiff and the Class)**

152.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

153.    A relationship existed between Plaintiff, the Class Members, and Carvin, which arose from Carvin's acceptance of Plaintiff's and the Class Members' PII and Carvin's representations of its commitment to protect said PII.

154.    The interests of public policy mandate that a fiduciary duty is imputed given Carvin's acceptance of Plaintiff's and the Class Members' PII and Carvin's representations of its commitment to protect said PII.

155.    Carvin breached the fiduciary duty that it owed to Plaintiff and Class Members. Specifically, because Carvin failed to act with the utmost good faith, fairness, honesty, and the highest and finest loyalty—and ultimately, by failing to protect the PII of Plaintiff and Class Members.

156.    Carvin's breach of fiduciary duty was a legal cause of damage to Plaintiff and Class Members.

157.    But for Carvin's breach of fiduciary duty, the damage to Plaintiff and Class Members would not have occurred.

158.    Carvin's breach of fiduciary duty contributed substantially to producing the damage to Plaintiff and Class Members.

159.    As a direct and proximate result of Carvin's breach of fiduciary duty, Plaintiff and Class Members are entitled to, and demand, actual, consequential, nominal damages, and injunctive relief.

/ / / /

/ / / /

/ / / /

**FIFTH CAUSE OF ACTION**

**Violation of the California Consumer Privacy Act ("CCPA"), Cal. Civ. Code §
1798.150**
**(On Behalf of Plaintiff and the California Subclass)**

160.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

161.    Defendant violated §1798.150 of the CCPA by failing to implement and maintain reasonable security procedures and practices appropriate to the nature of the information to protect the nonencrypted PII of Plaintiff. As a direct and proximate result, Plaintiff's PII was subject to unauthorized access and exfiltration, theft, or disclosure.

162.    Defendant is a business organized for the profit and financial benefit of its owners according to §1798.140, with annual gross revenues exceeding the threshold established by §1798.140(c).

163.    Plaintiff seeks injunctive or other equitable relief to ensure Defendant hereinafter adequately safeguards PII by implementing reasonable security procedures and practices. Such relief is particularly important because Defendant continues to hold PII, including Plaintiff's PII. Plaintiff has an interest in ensuring that his PII is reasonably protected, and Defendant has demonstrated a pattern of failing to adequately safeguard this information.

164.    Pursuant to Cal. Civ. Code §1798.150(b), Plaintiff mailed a CCPA notice letter to Defendant's registered service agents, detailing the specific provisions of the CCPA that Defendant has violated and continues to violate. If Defendant cannot cure within 30 days—and Plaintiff believes such cure is not possible under these facts and circumstances—then Plaintiff intends to promptly amend this Complaint to seek statutory damages as permitted by the CCPA.

165.    As described herein, an actual controversy has arisen and now exists as to whether Defendant implemented and maintained reasonable security procedures and

practices appropriate to the nature of the information to protect the personal information under the CCPA.

166.     A judicial determination of this issue is necessary and appropriate at this time under the circumstances to prevent further data breaches by Defendant.

**SIXTH CAUSE OF ACTION**
**Violation of California's Unfair Competition Law**
**Cal. Bus. Code § 17200, *et seq.***
**(On behalf of Plaintiff and the California Subclass)**

167.     Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

168.     Defendant engaged in unlawful and unfair business practices in violation of Cal. Bus. & Prof. Code §17200, *et seq*. which prohibits unlawful, unfair, or fraudulent business acts or practices ("UCL").

169.     Defendant's conduct is unlawful because it violates the California Consumer Privacy Act of 2018, Civ. Code §1798.100, *et seq*. (the "CCPA"), and other state data security laws.

170.     Defendant stored the PII of Plaintiff and the California Subclass in its computer systems and knew or should have known it did not employ reasonable, industry standard, and appropriate security measures that complied with applicable regulations and that would have kept Plaintiff's and the California Subclass's PII secure and prevented the loss or misuse of that PII.

171.     Defendant failed to disclose to Plaintiff and the California Subclass that their PII was not secure. However, Plaintiff and the California Subclass were entitled to assume, and did assume, that Defendant had secured their PII. At no time were Plaintiff and the California Subclass on notice that their PII was not secure, which Defendant had a duty to disclose.

172.    Defendant also violated California Civil Code §1798.150 by failing to employ reasonable security measures, resulting in an unauthorized access and exfiltration, theft, or disclosure of Plaintiff's and the California Subclass's PII.

173.    Had Defendant complied with these requirements, Plaintiff and the California Subclass would not have suffered the damages related to the Data Breach.

174.    Defendant's conduct was unlawful, in that it violated the Consumer Records Act.

175.    Defendant's conduct was also unfair, in that it violated a clear legislative policy in favor of protecting consumers from data breaches.

176.    Defendant's conduct is an unfair business practice under the UCL because it was immoral, unethical, oppressive, and unscrupulous and caused substantial harm. This conduct includes employing unreasonable and inadequate data security despite its business model of actively collecting PII.

177.    Defendant also engaged in unfair business practices under the "tethering test." Its actions and omissions, as described above, violated fundamental public policies expressed by the California Legislature. *See, e.g*., Cal. Civ. Code §1798.1 ("The Legislature declares that . . . all individuals have a right of privacy in information pertaining to them . . . The increasing use of computers . . . has greatly magnified the potential risk to individual privacy that can occur from the maintenance of personal information."); Cal. Civ. Code §1798.81.5(a) ("It is the intent of the Legislature to ensure that personal information about California residents is protected."); Cal. Bus. & Prof. Code §22578 ("It is the intent of the Legislature that this chapter [including the Online Privacy Protection Act] is a matter of statewide concern."). Defendant's acts and omissions thus amount to a violation of the law.

178.    Instead, Defendant made the PII of Plaintiff and the California Subclass accessible to scammers, identity thieves, and other malicious actors, subjecting Plaintiff and the California Subclass to an impending risk of identity theft. Additionally, Defendant's

conduct was unfair under the UCL because it violated the policies underlying the laws set out in the prior paragraph.

179.    As a result of those unlawful and unfair business practices, Plaintiff and the California Subclass suffered an injury-in-fact and have lost money or property.

180.    The injuries to Plaintiff and the California Subclass greatly outweigh any alleged countervailing benefit to consumers or competition under all of the circumstances.

181.    There were reasonably available alternatives to further Defendant's legitimate business interests, other than the misconduct alleged in this complaint.

182.    Therefore, Plaintiff and the California Subclass are entitled to equitable relief, including restitution of all monies paid to, or received by, Defendant; disgorgement of all profits accruing to Defendant because of its unfair and improper business practices; a permanent injunction enjoining Defendant's unlawful and unfair business activities; and any other equitable relief the Court deems proper.

### SEVENTH CAUSE OF ACTION
**Declaratory Judgment and Injunctive Relief**
**(On behalf of Plaintiff and the Class)**

183.    Plaintiff re-alleges and incorporates by reference all other paragraphs in the Complaint as if fully set forth herein.

184.    Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, *et seq.*, this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and to grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as those alleged herein, which are tortious and which violate the terms of the federal and state statutes described above.

185.    An actual controversy has arisen in the wake of the Data Breach at issue regarding Defendant's common law and other duties to act reasonably with respect to employing reasonable data security. Plaintiff alleges that Defendant's actions in this respect were inadequate and unreasonable and, upon information and belief, remain inadequate

and unreasonable. Additionally, Plaintiff and the Class continue to suffer injury due to the continued and ongoing threat of new or additional fraud against them or on their accounts using the stolen data.

186.    Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring, among other things, the following:

      a.  Defendant owed, and continues to owe, a legal duty to employ reasonable data security to secure the PII it possesses, and to notify impacted individuals of the Data Breach under the common law and Section 5 of the FTCA;

      b.  Defendant breached, and continues to breach, its duty by failing to employ reasonable measures to secure its customers' PII; and

      c.  Defendant's breach of its legal duty continues to cause harm to Plaintiff and the Classes.

187.    The Court should also issue corresponding injunctive relief requiring Defendant to employ adequate security protocols consistent with industry standards to protect its customers' (i.e. Plaintiff's and the Class's) data.

188.    If an injunction is not issued, Plaintiff and the Class will suffer irreparable injury and lack an adequate legal remedy in the event of another breach of Defendant's data systems. If another breach of Defendant's data systems occurs, Plaintiff and the Class will not have an adequate remedy at law because many of the resulting injuries are not readily quantified in full and they will be forced to bring multiple lawsuits to rectify the same conduct. Simply put, monetary damages, while warranted to compensate Plaintiff and the Class for their out-of-pocket and other damages that are legally quantifiable and provable, do not cover the full extent of injuries suffered by Plaintiff and the Class, which include monetary damages that are not legally quantifiable or provable.

189.    The hardship to Plaintiff and the Class, if an injunction does not issue, exceeds the hardship to Defendant if an injunction is issued.

190.    Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach, thus eliminating the injuries that would result to Plaintiff, the Class, and the public at large.

## PRAYER FOR RELIEF

WHEREFORE Plaintiff, on behalf of himself and all others similarly situated, requests the following relief:

A.    An Order certifying this action as a class action and appointing Plaintiff as Class representative and the undersigned as Class counsel;

B.    A mandatory injunction directing Carvin to adequately safeguard the PII of Plaintiff and the Class hereinafter by implementing improved security procedures and measures, including but not limited to an Order:

    i.    prohibiting Carvin from engaging in the wrongful and unlawful acts described herein;

    ii.    requiring Carvin to protect, including through encryption, all data collected through the course of business in accordance with all applicable regulations, industry standards, and federal, state or local laws;

    iii.    requiring Carvin to delete and purge the PII of Plaintiff and Class Members unless Carvin can provide to the Court reasonable justification for the retention and use of such information when weighed against the privacy interests of Plaintiff and Class Members;

    iv.    requiring Carvin to implement and maintain a comprehensive Information Security Program designed to protect the confidentiality and integrity of Plaintiff's and Class Members' PII;

    v.    requiring Carvin to engage independent, third-party security auditors and internal personnel to run automated security monitoring, simulated

attacks, penetration tests, and audits on Carvin's systems on a periodic basis;

vi.  requiring Carvin to segment data by creating firewalls and access controls so that, if one area of Carvin's network is compromised, hackers cannot gain access to other portions of Carvin's systems;

vii.  requiring Carvin to conduct regular database scanning and securing checks;

viii.  requiring Carvin to monitor ingress and egress of all network traffic;

ix.  requiring Carvin to establish an information security training program that includes at least annual information security training for all employees, with additional training to be provided as appropriate based upon the employees' respective responsibilities with handling PII, as well as protecting the PII of Plaintiff and Class Members;

x.  requiring Carvin to implement a system of tests to assess its respective employees' knowledge of the education programs discussed in the preceding subparagraphs, as well as randomly and periodically testing employees' compliance with Carvin's policies, programs, and systems for protecting personal identifying information;

xi.  requiring Carvin to implement, maintain, review, and revise as necessary a threat management program to appropriately monitor Carvin's networks for internal and external threats, and assess whether monitoring tools are properly configured, tested, and updated;

xii.  requiring Carvin to meaningfully educate all Class Members about the threats that they face because of the loss of its confidential personal identifying information to third parties, as well as the steps affected individuals must take to protect themselves; and

1              xiii.    requiring Carvin to provide adequate credit monitoring to all Class

2                      Members.

3      C.    A mandatory injunction requiring that Carvin provide notice to each member

4            of the Class relating to the full nature and extent of the Data Breach and the

5            disclosure of PII to unauthorized persons;

6      D.    Enjoining Carvin from further deceptive practices and making untrue

7            statements about the Data Breach and the stolen PII;

8      E.    An award of damages, including actual, nominal, consequential damages, and

9            punitive, as allowed by law in an amount to be determined;

10    F.    An award of attorneys' fees, costs, and litigation expenses, as allowed by law;

11    G.    An award of pre- and post-judgment interest, costs, attorneys' fees, expenses,

12           and interest as permitted by law;

13    H.    Granting the Plaintiff and the Class leave to amend this complaint to conform

14           to the evidence produced at trial;

15    I.    For all other Orders, findings, and determinations identified and sought in this

16           Complaint; and

17    J.    Such other and further relief as this court may deem just and proper.

18                          **<u>JURY TRIAL DEMANDED</u>**

19        Under Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury for

20  any and all issues in this action so triable as of right.

21

22  Date: May 15, 2023                Respectfully submitted,

23                          By: *<u>/s/ Elaine A. Ryan</u>*

24                            Elaine A. Ryan (AZ Bar #012870)

                                Colleen M. Auer (AZ Bar #014637)

25                            **AUER RYAN, P.C.**

26                            20987 N. John Wayne Parkway, #B104-374

                                  Maricopa, AZ 85139

27                            Telephone: (520) 705-7332

28

eryan@auer-ryan.com
cauer@auer-ryan.com

**TURKE & STRAUSS LLP**
Raina C. Borrelli (*pro hac vice* anticipated)
613 Williamson Street, Suite 201
Madison, Wisconsin 53703
Telephone: (608) 237-1775
Facsimile: (608) 509-4423
raina@turkestrauss.com

*Attorneys for Plaintiff and Proposed Class*

# EXHIBIT  1

Carvin Software, LLC ("Carvin Software") is providing notice of this event on behalf of its potentially impacted business entity customer(s). For a list of the relevant Carvin Software business entity customer(s) ("Data Owners"), please see *Exhibit A*. By providing this notice, Carvin Software does not waive any rights or defenses regarding the applicability of Maine law, the applicability of the Maine data event notification statute, or personal jurisdiction.

### Nature of the Data Event

On March 9, 2023, Carvin Software identified unusual activity on certain systems within its computer network. In response, Carvin Software promptly isolated the affected systems and commenced a comprehensive investigation into the full nature and scope of the activity. On March 27, 2023, the investigation determined that certain files were copied from the network without authorization between February 22, 2023, and March 9, 2023. Carvin Software undertook a comprehensive review of the files in order to determine what information was potentially present in those files and to whom it related. On or about March 29, 2023, Carvin Software completed the initial review and it determined that although the information varies by individual the files contained information including name, Social Security number, and financial account information. On April 18, 2023, Carvin Software began providing notice to the Data Owners who are associated with this information.

### Notice to Maine Residents

On May 2, 2023, Carvin Software began providing written notice of this incident on behalf of relevant Data Owners to three thousand nine hundred and forty-eight (3,948) Maine residents. Written notice is being provided in substantially the same form as the letter attached here as *Exhibit B*.

### Other Steps Taken and To Be Taken

Upon discovering the event, Carvin Software moved quickly to investigate and respond to the incident, assess the security of its systems, and identify potentially affected individuals. Further, Carvin Software notified federal law enforcement and the potentially impacted Data Owners regarding the event. Carvin Software is also evaluating its policies and procedures and implementing additional measures to further safeguard information on its network. Carvin Software is providing access to credit monitoring services for twelve months, through IDX, to individuals whose personal information was potentially affected by this incident, at no cost to these individuals.

Additionally, Carvin Software is providing individuals with guidance on how to better protect against identity theft and fraud. Carvin Software is providing individuals with information on how to place a fraud alert and security freeze on one's credit file, the contact details for the national consumer reporting agencies, information on how to obtain a free credit report, a reminder to remain vigilant for incidents of fraud and identity theft by reviewing account statements and monitoring free credit reports, and encouragement to contact the Federal Trade Commission, their state Attorney General, and law enforcement to report attempted or actual identity theft and fraud.

Carvin Software is providing written notice of this incident to relevant state regulators, as necessary, and to the three major credit reporting agencies, Equifax, Experian, and TransUnion.

# EXHIBIT A

Ace Personnel
Apple Staffing
Arastaff
Atlas Management
Complete Labor
EmployUS
Encore
FloydLeeLocums
G1Staffing
Heartland Labor
Jack Of All Trades
Kwikjobs
Labor Exchange
Labor for Hire
Labor Force
Labor Masters
Labor Smart
LC Staffing
MCMStaffing
On Demand Staffing INC
Paydayz Staffing
PersonnelServices
Pirate Staffing
Platinum Recruiting
Prestige Staffing
Rose Employment Solutions
Square One
StarStaffing
Terry Neese Personnel
WorkForce
WorkStuffStaffingSolutions

# EXHIBIT B



**CARVIN SOFTWARE**
SOFTWARE & CONSULTING SERVICES

PO Box 480149
Niles, IL 60714

To Enroll, Please Call:
1-888-567-0279
Or Visit:
https://response.idx.us/carvinsoftware
Enrollment Code: [XXXXXXXX]

<<First Name>> <<Last Name>>
<<Address 1>>
<<Address 2>>
<<City>>, <<State>> <<Zip>>

May 2, 2023

**<<NOTICE OF DATA BREACH>>**

Dear <<First Name>> <<Last Name>>:

Carvin Software, LLC ("Carvin Software") is writing to inform you of an incident that involves some of your information. Carvin Software has your information because we offer staffing software solutions and consulting services to <<Data Owner>>. This letter includes information about the incident, our response, and steps you may take to protect your personal information, if you feel it is appropriate to do so.

**What Happened?** On March 9, 2023, Carvin Software identified unusual activity on certain systems within our computer network. We promptly isolated the affected systems and commenced a comprehensive investigation into the full nature and scope of the activity. On March 27, 2023, the investigation determined that certain files were copied from our network without authorization between February 22, 2023, and March 9, 2023. Carvin Software then undertook a comprehensive review of the files in order to determine what specific information was present in those files and to whom that information related. This review was completed on March 29, 2023. We then worked to notify you and provide information and services to assist you in protecting your data.

**What Information Was Involved?** Our investigation determined that the affected files contained information including your <<Data Elements>>, and name.

**What We Are Doing.** We are notifying you about this incident and providing you access to complimentary credit monitoring services. Further, we implemented additional technical security measures, and are evaluating our policies and procedures to further safeguard information in our systems. We also notified federal law enforcement of this event.

**What You Can Do.** We encourage you to remain vigilant against incidents of identity theft and fraud by reviewing your account statements and monitoring your free credit reports for suspicious activity and to detect errors. We also recommend you review the "Steps You Can Take to Help Protect Personal Information" section of this letter. Further, you may enroll in the offered complimentary credit monitoring services. Enrollment instructions are on the next page of this letter. Please note, we are unable to enroll you. You will need to follow the instructions included in this letter in order to enroll yourself in the services being offered.

**For More Information.** If you have questions about this matter, please contact our dedicated assistance line at 1-888-567-0279, Monday through Friday from 9:00 a.m. to 9:00 p.m. EST (excluding U.S. holidays). You may also write to Carvin Software at 70 South Val Vista Drive, Suite A3, Gilbert, AZ 85296.

**Si necesita assistencia en español, comuníquese con nosotros al 1-888-567-0279, de lunes a viernes de 9:00 a. m. a 9:00 p. m. EST (excluyendo los días festivos de EE. UU.)**

Sincerely,

Carvin Wilson
Owner & CEO
Carvin Software, LLC

### Steps You Can Take to Help Protect Personal Information

**Enroll in Credit Monitoring**

We are offering identity theft protection services through IDX, A ZeroFox Company, the data breach and recovery services expert. IDX identity protection services include: <<12/24>> months of credit and CyberScan monitoring, a $1,000,000 insurance reimbursement policy, and fully managed I.D. theft recovery services. With this protection, IDX will help you resolve issues if your identity is compromised.

Go to https://response.idx.us/carvinsoftware or call 1-888-567-0279 and follow the instructions for enrollment using your Enrollment Code provided at the top of the first page of this letter. Please note the deadline to enroll is August 2, 2023.

**Monitor Your Accounts**

Under U.S. law, a consumer is entitled to one free credit report annually from each of the three major credit reporting bureaus, Equifax, Experian, and TransUnion. To order your free credit report, visit www.annualcreditreport.com or call, toll-free, 1-877-322-8228. You may also directly contact the three major credit reporting bureaus listed below to request a free copy of your credit report.

Consumers have the right to place an initial or extended "fraud alert" on a credit file at no cost. An initial fraud alert is a 1-year alert that is placed on a consumer's credit file. Upon seeing a fraud alert display on a consumer's credit file, a business is required to take steps to verify the consumer's identity before extending new credit. If you are a victim of identity theft, you are entitled to an extended fraud alert, which is a fraud alert lasting seven years. Should you wish to place a fraud alert, please contact any one of the three major credit reporting bureaus listed below.

As an alternative to a fraud alert, consumers have the right to place a "credit freeze" on a credit report, which will prohibit a credit bureau from releasing information in the credit report without the consumer's express authorization. The credit freeze is designed to prevent credit, loans, and services from being approved in your name without your consent. However, you should be aware that using a credit freeze to take control over who gets access to the personal and financial information in your credit report may delay, interfere with, or prohibit the timely approval of any subsequent request or application you make regarding a new loan, credit, mortgage, or any other account involving the extension of credit. Pursuant to federal law, you cannot be charged to place or lift a credit freeze on your credit report. To request a security freeze, you will need to provide the following information:

1. Full name (including middle initial as well as Jr., Sr., II, III, etc.);

2. Social Security number;

3. Date of birth;

4. Addresses for the prior two to five years;

5. Proof of current address, such as a current utility bill or telephone bill;

6. A legible photocopy of a government-issued identification card (state driver's license or ID card, etc.); and

7. A copy of either the police report, investigative report, or complaint to a law enforcement agency concerning identity theft if you are a victim of identity theft.

Should you wish to place a credit freeze, please contact the three major credit reporting bureaus listed below:

| Equifax | Experian | TransUnion |
|---|---|---|
| https://www.equifax.com/personal/credit report-services/ | https://www.experian.com/help/ | https://www.transunion.com/credit help |
| 888-298-0045 | 1-888-397-3742 | 1 (800) 916-8800 |
| Equifax Fraud Alert, P.O. Box 105069 Atlanta, GA 30348-5069 | Experian Fraud Alert, P.O. Box 9554, Allen, TX 75013 | TransUnion Fraud Alert, P.O. Box 2000, Chester, PA 19016 |
| Equifax Credit Freeze, P.O. Box 105788 Atlanta, GA 30348-5788 | Experian Credit Freeze, P.O. Box 9554, Allen, TX 75013 | TransUnion Credit Freeze, P.O. Box 160, Woodlyn, PA 19094 |

**Additional Information**

You may further educate yourself regarding identity theft, fraud alerts, credit freezes, and the steps you can take to protect your personal information by contacting the consumer reporting bureaus, the Federal Trade Commission, or your state Attorney General. The Federal Trade Commission may be reached at: 600 Pennsylvania Avenue NW, Washington, DC 20580; www.identitytheft.gov; 1-877-ID-THEFT (1-877-438-4338); and TTY: 1-866-653-4261. The Federal Trade Commission also encourages those who discover that their information has been misused to file a complaint with them. You can obtain further information on how to file such a complaint by way of the contact information listed above. You have the right to file a police report if you ever experience identity theft or fraud. Please note that in order to file a report with law enforcement for identity theft, you will likely need to provide some proof that you have been a victim. Instances of known or suspected identity theft should also be reported to law enforcement and your state Attorney General. This notice has not been delayed by law enforcement.

*For District of Columbia residents*, the District of Columbia Attorney General may be contacted at: 400 6th Street, NW, Washington, DC 20001; 202-727-3400; and oag.dc.gov.

*For Maryland residents*, the Maryland Attorney General may be contacted at: 200 St. Paul Place, 16th Floor, Baltimore, MD 21202; 1-410-528-8662 or 1-888-743-0023; and www.oag.state.md.us.

*For New Mexico residents*, you have rights pursuant to the Fair Credit Reporting Act, such as the right to be told if information in your credit file has been used against you, the right to know what is in your credit file, the right to ask for your credit score, and the right to dispute incomplete or inaccurate information. Further, pursuant to the Fair Credit Reporting Act, the consumer reporting bureaus must correct or delete inaccurate, incomplete, or unverifiable information; consumer reporting agencies may not report outdated negative information; access to your file is limited; you must give your consent for credit reports to be provided to employers; you may limit "prescreened" offers of credit and insurance you get based on information in your credit report; and you may seek damages from violator. You may have additional rights under the Fair Credit Reporting Act not summarized here. Identity theft victims and active duty military personnel have specific additional rights pursuant to the Fair Credit Reporting Act. We encourage you to review your rights pursuant to the Fair Credit Reporting Act by visiting www.consumerfinance.gov/f/201504_cfpb_summary_your-rights-under-fcra.pdf, or by writing Consumer Response Center, Room 130-A, Federal Trade Commission, 600 Pennsylvania Ave. N.W., Washington, D.C. 20580.

*For New York residents,* the New York Attorney General may be contacted at: Office of the Attorney General, The Capitol, Albany, NY 12224-0341; 1-800-771-7755; or https://ag.ny.gov/.

*For North Carolina residents*, the North Carolina Attorney General may be contacted at: 9001 Mail Service Center, Raleigh, NC 27699-9001; 1-877-566-7226 or 1-919-716-6000; and www.ncdoj.gov.

*For Rhode Island residents*, the Rhode Island Attorney General may be reached at: 150 South Main Street, Providence, RI 02903; www.riag.ri.gov; and 1-401-274-4400. Under Rhode Island law, you have the right to obtain any police report filed in regard to this incident. There are <<Number of RI Residents Post NCOA>> Rhode Island residents impacted by this incident.